No. 25-5667

# IN THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

Jacob Julick,

Plaintiff–Appellant,

v.

Scott Jordan, et al.,

Defendants–Appellees.

On Appeal from a Final Judgment of the
United States District Court for the Western District of Kentucky
Case No. 5:23-cv-51, Hon. Joseph H. McKinley Jr.

## REPLY BRIEF

| | |
|---|---|
| | Jim Davy |
| BOSTON UNIVERSITY APPELLATE CLINIC | ALL RISE TRIAL & APPELLATE |
| 765 Commonwealth Ave. | P.O. Box 15216 |
| Suite 1304 | Philadelphia, PA 19125 |
| Boston, MA 02215 | (215) 792-3579 |
| (617) 835-0884 | jimdavy@allriselaw.org |
| | |
| Aryssa Harris | Counsel for Appellant |
| Cameron Tong | |
| Student Counsel | |

May 11, 2026

# TABLE OF CONTENTS

**Page(s)**

Table of Authorities.................................................................................iii

Argument ............................................................................................. 1

I.    This Court should squarely reject Appellees' invitation to
      resolve disputed facts in their favor. ................................................ 2

II.   Even if Appellees could rely on their own version of the facts,
      the law requires reversal. ............................................................... 7

    A.   Under this Court's precedents, Appellees cannot justify
           repeated use of OC spray against a restrained,
           nonthreatening individual. ........................................................ 8

        1.   Appellees' exclusive focus on "compliance" cannot
                displace the multi-factor analysis this Court applies.......... 8

        2.   In the multi-factor analysis, the record
                demonstrates that Bond acted maliciously and
                sadistically. ........................................................................ 11

    B.   Appellees concede the subjective prong of the conditions
           of confinement claim, and make numerous mistakes in
           analyzing the objective prong. ................................................. 15

        1.   Conditions are analyzed in their totality, not
                disaggregated for individual dismissal. ............................. 16

        2.   Appellees cannot rely on purported exigent
                circumstances to excuse the conditions in which
                they held Julick. ............................................................... 20

Conclusion.......................................................................................... 23

Certificates......................................................................................... 1a

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Barnes v. Felix,*
605 U.S. 73 (2025) ............................................................ 11, 13

*Bellamy v. Bradley,*
729 F.2d 416 (6th Cir. 1984) .............................................. 16

*Brown v. Mahlman,*
No. 1:22-CV-00239, 2022 WL 17817615 (S.D. Ohio Dec. 19, 2022)
............................................................................................ 17, 18

*Caldwell v. Moore,*
968 F.2d 595 (6th Cir. 1992) ................................................ 9

*Chilton v. Walters,*
No. 3:21 CV 1312, 2022 WL 541193 (N.D. Ohio Feb. 23, 2022) ......... 22

*Coble v. City of White House,*
634 F.3d 865 (6th Cir. 2011) ................................................ 5

*Cordell v. McKinney,*
759 F.3d 573 (6th Cir. 2014) ............................. 1, 2, 8, 9, 10, 11, 12, 13

*El Bey v. Roop,*
530 F.3d 407 (6th Cir. 2008) ................................................ 3

*Farmer v. Brennan,*
511 U.S. 825 (1994) ............................................................ 16

*Hudson v. McMillian,*
503 U.S. 1 (1992) ....................................................... 1, 8, 9, 15

*Jennings v. Mitchell,*
93 F. App'x 723 (6th Cir. 2004) ......................................... 10

*Johnson v. Cool,*
No. 1:22-CV-00031, 2024 WL 3992412 (S.D. Ohio Aug. 29, 2024),
*report and recommendation adopted,* No. 1:22-CV-31, 2025 WL
360607 (S.D. Ohio Jan. 31, 2025) ...................................... 22

*Keel v. Davidson Cnty. Sheriff's Off.,*
No. CIV. 3:13-1145, 2015 WL 799724 (M.D. Tenn. Feb. 25, 2015) ..... 18

*Lavado v. Keohane,*
992 F.2d 601 (6th Cir. 1993) ................................................ 3

*Moore v. Goulet.*
No. 1:22-CV-279, 2023 WL 6050393 (W.D. Mich. Aug. 21, 2023),

**TABLE OF AUTHORITIES—continued**

**Page(s)**

*report and recommendation adopted*, No. 1:22-CV-279, 2023 WL
6037609 (W.D. Mich. Sep. 15, 2023) .................................................. 17
*Richmond v. Settles*,
450 F. App'x 448 (6th Cir. 2011) ...................................................... 20
*Rivers v. Pitcher*,
68 F.3d 475 (6th Cir. 1995) (unpublished)........................................ 19
*Taylor v. Riojas*,
592 U.S. 7 (2020) ............................................................ 1, 18, 19, 20
*Taylor v. Wright*,
No. 20-13041, 2023 WL 5822761 (E.D. Mich. Apr. 19, 2023), *report
and recommendation adopted*, No. 20-13041, 2023 WL 4906586 (E.D.
Mich. Aug. 1, 2023) ........................................................................ 18
*Walker v. Mintzes*,
771 F.2d 920 (6th Cir. 1985)........................................................ 19, 20
*Watison v. Perry*,
No. 23-5059, 2024 WL 3461194 (6th Cir. Feb. 15, 2024) ................... 17
*Whitley v. Albers*,
475 U.S. 312 (1986) ......................................................... 1, 8, 9, 12, 13
*Wilkins v. Gaddy*,
559 U.S. 34 (2010) (per curiam) ...................................................... 15
*Wilson v. Seiter*,
501 U.S. 294 (1991) ........................................................................ 16

## ARGUMENT

Appellees' Response Brief asks this Court to adopt their version of disputed facts and credit their post hoc rationalizations. At every turn, Appellees rely on Bond's self-serving account over Julick's verified complaint and corroborating evidence—including the video—to argue that Julick was "noncompliant" and posed a threat, and they point to Julick's disputed involvement in the December 25th incident to justify the conditions they imposed on him. *E.g.* Resp. Br. at 2-3, 9, 15-18. But on the posture, this Court must view all facts and draw all reasonable inferences in favor of Julick. *Cordell v. McKinney*, 759 F.3d 573, 579 (6th Cir. 2014). Appellees' inversion of the standard only underscores why this Court should reverse.

Setting aside Appellees' improper factual framing, Appellees are wrong on the law. Their brief ignores and fails to respond to binding Supreme Court and Sixth Circuit authority cited in Julick's Opening Brief—including *Whitley v. Albers*, 475 U.S. 312 (1986), *Hudson v. McMillian*, 503 U.S. 1 (1992), *Taylor v. Riojas*, 592 U.S. 7 (2020), and *Cordell*, 759 F.3d—that held that the use of chemical spray on a restrained, nonthreatening prisoner violates Eighth Amendment, as do the conditions in which they confined Julick. The primary authorities Appellees cite and discuss instead are nonbinding, distinguishable, and unpersuasive on their own terms.

1

Appellees also apparently concede several relevant issues. They do not address the subjective component of Julick's conditions-of-confinement claim at all—so if the Court agrees that a reasonable jury could believe the conditions fell below the constitutional floor, Appellees have conceded that Denny, Primozich Villasenor, and Jordan were deliberately indifferent to Julick's health and safety. *See* Opening Br. at 36-39; *see generally* Resp. Br. at 17-27. Nor do they raise qualified immunity as to either claim, despite having briefly asserted it below. *See* Summ. J. Motion, RE43, PageID # 236-37; *see generally* Resp. Br.

Under the circumstances, the Court should reverse the district court's grant of summary judgment and remand for further proceedings.

I.   **This Court should squarely reject Appellees' invitation to resolve disputed facts in their favor.**

Contrary to the procedural posture, Appellees offer their own narrative—repeatedly treating disputed facts as settled, sidestepping record evidence that undermines their position, and resting on their own credibility. That is the province of a jury, not a court reviewing summary judgment. *See Cordell*, 759 F.3d at 579; *see* Opening Br. at 15. Appellant will not belabor this point, but would highlight four key examples that exemplify their approach and underscore the need for reversal. First, Appellees insist on construing the video evidence to avoid the central dispute on the excessive-force claim—whether Julick posed any threat to Bond. Second, Appellees selectively credit Bond's self-serving affidavit,

2

despite Officer Neilson's direct contradiction of Bond's stated justification for deploying force—enough on its own to create a dispute. Third, Appellees insist that Julick was "involved" in the December 25th assault, despite evidence to the contrary. And fourth, Appellees characterize the conditions they imposed on Julick as a legitimate security response, when the record supports a contrary inference that they imposed the conditions to retaliate against Julick without justification.

**1.** Whether Julick posed any threat whatsoever to Bond is the central factual dispute on the excessive-force claim—and Appellees ask this Court to resolve it in their favor. Appellees exclusively cite Bond's account—that Julick was "noncompliant" and "repeatedly" turning his head. *E.g.* Resp. Br. at 9, 15-17. But the video shows Julick handcuffed, shackled, kneeling in a compliance position, and facing the wall on the opposite side of a locked cage from Bond. *Compare* Institutional Video, RE41, 0:00-0:31, and Amend. Compl., RE22, PageID # 141 (showing and alleging that Julick was kneeling, handcuffed, shackled, and facing wall), *with* Bond Aff., RE59-8, PageID # 501 (averring that Julick exhibited "combative behavior").[1] At most, Julick turned his head while his body

---

[1] A verified complaint "carries the same weight as would an affidavit for the purposes of summary judgment." *El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008); *see also Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993) (recognizing verified complaint "'[has] the same force and effect as an affidavit' for purposes of responding to a motion for summary judgment").

remained facing the wall. *See* Opening Br. at 14. But even that cannot establish a threat as a matter of law because the video shows other officers on scene finding no need to deploy force against Julick. *See* Opening Br. at 21, 26. Appellees' characterization of Julick as posing any threat requiring chemical force is at minimum disputed, and a reasonable jury could find that Julick was fully compliant and posed no threat to Bond.

**2.** Whether Bond fabricated his justification for deploying force is similarly sharply disputed, yet Appellees selectively credit Bond's affidavit while ignoring countervailing evidence in the record. Bond's ostensible justification for using force—that Julick was attempting to spit on him—is directly contradicted by Officer Neilson, who "spoke up for Julick" at a disciplinary hearing and shared that "he never" saw Julick attempt to spit. *Compare* Institutional Video, RE41, 0:00-0:50 (showing Bond deploying three separate bursts on a fully restrained, non-threatening Julick), Amend. Compl. RE22, PageID # 141-42, and Smith Aff., RE6-1, PageID # 79 (Bond "has a history of using excessive force"), *with* Disciplinary Rep. No. KSP-2023-0001813, RE43-6, PageID # 302-03, and Bond Aff., RE59-8, PageID # 500-01. Appellees do not even mention Neilson's account, which alone creates a dispute of material fact, because it represents a fellow officer present during the incident directly contradicting Bond's sole stated justification for deploying chemical force. Even without Neilson, the video itself undermines Bond's credibility:

4

Bond reported deploying only "one short burst" of pepper spray (Disciplinary Rep. Form, RE6-1, PageID # 53), but the video shows three separate bursts (Institutional Video, RE41, 0:00-1:12).

Despite this, Appellees argue that "the actions of Julick, and Bond's reaction thereto, are undisputed." Resp. Br. at 18. That is simply wrong. The Parties dispute whether Bond's stated justifications were genuine or fabricated, and a jury could credit a fellow officer's direct contradiction of Bond's self-serving affidavit by resolving quintessential credibility and factual disputes against Appellees. *See Coble v. City of White House*, 634 F.3d 865, 870 (6th Cir. 2011). At summary judgment, this Court must construe these disputes in Julick's favor—not resolve them for Appellees.

**3.** Appellees also ignore the dispute as to the justification for the conditions they imposed on Julick. Appellees point to his purported involvement in a December 25th assault, but his complaint and other record evidence shows both that he was not involved in the December 25th assault, and that officers knew that even at the time. *Compare* Amend. Compl., RE22, PageID # 141 (alleging Julick "was not involved"), Gridar Jr. Aff., RE6-1, PageID # 77, and Smith Aff., RE6-1, PageID # 79 (affiants corroborating), *with* Extraordinary Occurrence Rep. No. KSP-2022-12-100, RE43-3, PageID # 263-88, and 12/25/22 Behavioral Control Form, RE43-2, PageID # 261-62 (classifying Julick as involved in "STG related incident"). It would be enough that Julick's verified complaint alleges that he "was not involved." Opening Br. at 4; Amend. Compl.,

5

RE22, PageID # 141. But multiple affiants corroborated this allegation, confirming that officers "knew that most of these individuals had nothing to do with the assault." *See, e.g.*, Gridar Jr. Aff., RE6-1, PageID # 77; Smith Aff., RE6-1, PageID # 79. A jury must resolve whether Julick was actually involved in the December 25th assault, or whether Appellees used the incident as a pretext to punish him—and on this record, it could find that Appellees knew Julick was uninvolved and classified him as a threat without legitimate basis.

**4.** Appellees separately dispute the nature and purpose of the conditions Appellees imposed on Julick. A reasonable jury could conclude from the record that Appellees imposed the conditions on him not as a measured security response, but to retaliate and to compound Julick's suffering. Officers told Julick he was "being treated like this under the Warden Scott Jordan's firm orders," Amend. Compl., RE22, PageID # 144-46, and Denny mocked Julick's suicidal thoughts by telling him to "kill [him]self and do them the favor." *Id.* at PageID # 141. Julick alleges that for eight days, feces caked the walls, floor, and toilet of his cell, that Denny denied his requests for cleaning supplies, and that his mattress was confiscated," Amend. Compl., RE22, PageID # 141, 143-46, and six affiants corroborated those allegations. *See* Venerable Aff., RE6-1, PageID # 76; Gridar Jr. Aff., RE6-1, PageID # 77; Smith Aff., RE6-1, PageID # 79; Leuenberger Aff., RE6-1, PageID # 80; Merrill Aff., RE6-1, PageID # 81; McGuire Aff., RE6-1, PageID # 82. Medical records

document the resulting psychological harm. Med. Serv. Rep., RE6-1, PageID # 57. Appellees insist these restrictions were "necessary for the safety of inmate and secure operation of the facility." Summ. J. Motion, RE43, PageID # 225-26. But a reasonable jury crediting the record evidence—retaliatory statements, denial of basic sanitation, confiscation of bedding, and mockery of suicidal ideation—could find that Appellees were not truly concerned about safety, and acted to retaliate.

* * *

Appellees ask this Court to resolve numerous fact disputes in their favor. That is not the function of summary judgment. A jury must resolve them, and accordingly, this Court should reverse and remand for trial.

## II.   Even if Appellees could rely on their own version of the facts, the law requires reversal.

Appellees' legal arguments miss the mark even as applied to their misconstrued facts. On the excessive force claim, Appellees reduce the constitutional inquiry to a single question—whether Bond used OC spray to "gain compliance"—while ignoring the rest of the multi-factor analysis that binding precedent requires. *E.g.* Resp. Br. at 11, 15-18. On the conditions of confinement claim, Appellees misapply the objective prong, *id.* at 19-20, improperly disaggregate Julick's conditions from the required totality-of-the-circumstances analysis, *id.* at 20-21, and invoke a purported exigency defense based only on non-precedential and

7

distinguishable authority, *id.* at 21-26. Their legal arguments as to both claims are unpersuasive.

### A. Under this Court's precedents, Appellees cannot justify repeated use of OC spray against a restrained, nonthreatening individual.

Appellees make two fundamental errors in arguing for judgment on the excessive-force claim. First, Appellees collapse the constitutional inquiry into a single "compliance" question, ignoring the multi-factor framework that *Whitley*, *Hudson*, and *Cordell* require. Second, when a court properly applies the *Whitley* factors—even on Appellees' own version of the facts—each one points toward the conclusion that Bond acted maliciously and sadistically rather than in a good faith effort to maintain discipline.

### 1. Appellees' exclusive focus on "compliance" cannot displace the multi-factor analysis this Court applies.

The Supreme Court and this Court have squarely foreclosed Appellees' insistence that even minimal noncompliance justifies any amount of force. Appellees argue that the constitutional inquiry begins and ends with a single question—whether Bond used OC spray to "gain compliance." Resp. Br. at 11-18. But even if Julick had been noncompliant, that would inform just one of the five factors in the governing framework, which evaluates: (1) the need for force; (2) the relationship between that need and the amount of force used; (3) the

extent of the threat to safety as reasonably perceived by officials; (4) the extent of injury inflicted; and (5) any efforts made to temper the severity of the response. *Whitley*, 475 U.S. at 321; *Hudson*, 503 U.S. at 7; *Cordell*, 759 F.3d at 581. Courts distinguish legitimate efforts to maintain discipline from conduct intended to cause harm by analyzing all of the factors together. *Cordell*, 759 F.3d at 581. Noncompliance alone would not justify force as a matter of law.

Appellees' own authorities reinforce this very point. Appellees lean heavily on *Caldwell v. Moore*, 968 F.2d 595 (6th Cir. 1992), for the proposition that "[i]nmates cannot be permitted to decide which orders they will obey." Resp. Br. at 11 (quoting *Caldwell*, 968 F.2d at 601). But *Caldwell* itself did not treat noncompliance as dispositive; it still applied the full *Whitley* multi-factor analysis before concluding the force was constitutional. *Caldwell*, 968 F.2d at 601. And the other facts that justified the force in *Caldwell* demonstrate the sort of additional context that simply does not exist here—the incarcerated plaintiff there had been "shouting and kicking for seven hours" after a violent altercation, was housed in an isolation cell, and refused a direct order to stop. *Id.* And in its analysis, *Caldwell* underscores that a court must weigh all the *Whitley* factors.

Appellees' single-factor approach leads them similarly astray through their disregard for repeated holdings of this Court regarding use of force against already-restrained individuals. Simply put, physical restraints

minimize the potential threat posed and foreclose an overwhelmingly forceful response, because proportionality plays a key role in the second through fifth factors of the force analysis. In *Cordell*—this Court's most directly analogous binding precedent, which Appellees entirely ignore—this Court held that even a singular shove into a wall constituted excessive force when an incarcerated person was handcuffed and shackled, because the "threat" posed by the person's turn toward the officer could not be reconciled "with the amount of force" used. 759 F.3d at 583. If a single shove was disproportionate in Cordell, three deployments of OC spray and the brandishing of a taser against a more thoroughly restrained individual—Julick was handcuffed, shackled, kneeling, and locked behind a cage—cannot be justified merely by invoking "compliance." Appellees' reliance on *Jennings v. Mitchell*, 93 F. App'x 723, 725 (6th Cir. 2004), only reinforces the point: in *Jennings*, OC spray was permissible precisely because the incarcerated individual was unrestrained and actively refusing to exit a shower—a starkly different scenario from deploying chemical agents against a person who is handcuffed, shackled, kneeling in a compliance position, and locked behind a cage. *See* 93 F. App'x at 724-25.

10

### 2. In the multi-factor analysis, the record demonstrates that Bond acted maliciously and sadistically.

The Response Brief argues that Bond's use of force was proportional and taken in good faith. *See* Resp. Br. at 15-18. Appellees conclusions as to each factor are wrong. A reasonable jury could conclude—especially in light of the video evidence—that all the factors cut in Julick's favor and that Bond used force not in a good-faith effort to restore discipline, but for the very purpose of causing harm.

*Need for force* and *extent of the threat*

The record presents a genuine dispute as to whether Bond faced a threat that required the use chemical agents at all. Julick does not dispute that he turned his head. *E.g.* Amend. Compl., RE22, PageID # 141. But as discussed above, he was handcuffed, shackled, kneeling in a compliance position, and locked on the other side of a cage from Bond— fully restrained and incapable of posing a physical threat. *See Cordell*, 759 F.3d at 581-83; *see also* Institutional Video, RE41, at 0:00-0:50. A reasonable jury could conclude that Bond had no need for force at all. And even if some amount of force could have been justified, a reasonable jury could conclude that the extent of the threat to Bond was so minimal that it did not justify the force he employed—indeed, a jury might not reasonably conclude otherwise.

Nor was this the kind of split-second judgment about need that might warrant deference. *See* Resp. Br. at 15. The Supreme Court recently

11

reaffirmed that courts assessing the use of force must consider the "totality of the circumstances," including events leading up to use the force, because earlier facts "may bear on how a reasonable officer would have understood and responded to later ones." *Barnes v. Felix*, 605 U.S. 73, 79, 80 (2025). A court "cannot review the totality of the circumstances if it has put on chronological blinders." *Id.* at 82. Here, the full context of the encounter defeats any argument Appellees might make about a need to use force in the particular moment at issue. Bond watched Julick for more than twenty seconds before brandishing the canister, then sprayed him three times over nearly a minute. *E.g.* Summ. J. Op. & Order, RE68, PageID # 593-94; Institutional Video, RE41, 0:00-1:17. Bond pondered, decided on, and ultimately applied force over a deliberate and escalating sequence that *Barnes* tells us to consider; it was not a spontaneous response to imminent danger. Indeed, Bond was never in physical danger at any point during the encounter. Institutional Video, RE41, 0:00-1:17.

*Relationship between need and amount of force used* and *efforts to mitigate severity*

Relatedly, the force Bond used was grossly disproportionate to whatever need existed. Proportionality requires that the force used not exceed the amount needed to address the need that justified it. *See Whitley*, 475 U.S. at 321; *Cordell*, 759 F.3d at 581. Where the "need" here was, at most, securing marginal additional compliance from a fully restrained, kneeling person who briefly turned his head, Bond could

12

justify very little force. Instead, he used three deployments of OC spray, followed by the brandishing of a taser for more than seven minutes. Institutional Video, RE41, 0:34-8:27. Appellees argue that chemical force is not categorically prohibited, Resp. Br. at 16-17, and that's surely correct—but it's entirely beside the point here. Circumstances must justify the extent of the force used, including chemical force, and here they did not.

Nor, contrary to Appellees' assertions, did that Bond "temper[]" his force through verbal warnings, "short bursts," and Julick's eventual decontamination eleven minutes later. Resp. Br. at 18. Viewed in the totality required by *Barnes*, 605 U.S. at 79-80, the full arc of Bond's conduct reveals escalation, not mitigation or restraint: he progressed from brandishing OC spray, to deploying it three separate times, to wielding a taser—all against a person who was already handcuffed, shackled, kneeling, and separated from him by a locked cage. Institutional Video, RE41, 0:25-1:17. At no point did Bond attempt to de-escalate, back away from the locked cage, or employ any lesser means of obtaining compliance. The absence of restraint or attempts to de-escalate indicates a punitive rather than corrective purpose. *Whitley*, 475 U.S. at 322-24; *see also Cordell*, 759 F.3d at 582-83.

Indeed, the video provides the most powerful evidence that Bond's conduct was punitive rather than proportional to any possible need. The most significant inference comes from how every other officer present

13

behaved in comparison to Bond. When a female officer entered the room after the spraying, she observed the scene and shrugged at Bond, visibly questioning why he had a taser brandished when Julick presented no threat. Institutional Video, RE41, 1:34-35. After more than seven minutes, when another officer briefly took over watching Julick, he realized within seconds that he had no need for his taser given that Julick was handcuffed, shackled, and kneeling on the other side of a locked grate—and holstered it. *Id.* at 8:27-8:40. Later, a different officer spoke with an unshackled Julick face-to-face without threatening him or brandishing any weapon. *Id.* at 18:52-19:08. Appellees do not dispute any of this evidence. A reasonable jury could conclude, by comparing Bond's conduct to officers who behaved in a fundamentally different manner in response to the same circumstances, that Bond's force was punitive and unjustified.

### *Extent of injury*

Appellees attempt to minimize Julick's injuries, but that both mischaracterizes the record and misapprehends the governing standard. Appellees point to Licensed Practical Nurse Horne's observation that she "observed no injuries" during decontamination. Resp. Br. at 15. But the full record tells a different story. The video shows Julick's skin visibly reddening from the pepper spray over the course of the encounter, Institutional Video, RE41, 0:51-13:50, and officers present began coughing and donning masks from the lingering chemical agents, *see*

14

Opening Br. at 21. Julick sustained cognizable physical injuries, and there is at minimum a jury question as to their severity, rather than their existence. Even accepting Appellees' characterization of Julick's injuries as minimal, however, would not foreclose liability. The constitutional question turns on "the nature of the force rather than the extent of the injury." *Wilkins v. Gaddy*, 559 U.S. 34, 34 (2010) (per curiam). The Supreme Court has made clear that even where injuries are not "significant," force applied "maliciously and sadistically" to cause harm violates contemporary standards of decency. *Hudson*, 503 U.S. at 9.

**B.   Appellees concede the subjective prong of the conditions of confinement claim, and make numerous mistakes in analyzing the objective prong.**

Appellees' brief similarly goes wrong in its analysis of the conditions of confinement claim. As noted, Appellees make a fact-based argument about the nature of the deprivation they imposed on Julick. *See* Section I, *supra*. But analytically, they also wrongly disaggregate and individually dismiss the numerous awful features of his conditions, rather than undertaking the inquiry into the totality of the circumstances required by precedent. Appellees also suggest that exigent circumstances could have justified housing Julick in the dangerous conditions—but cite only a string of non-precedential and unpersuasive district court cases to support that wrong assertion. All of those arguments apply to the objective prong; Appellees do not make an

15

argument on the subjective prong of the conditions of confinement claim at all. Appellees' Response only emphasizes why this Court should reverse

### 1. Conditions are analyzed in their totality, not disaggregated for individual dismissal.

A plaintiff may prevail on a conditions of confinement claim when (1) the conditions they are incarcerated under were objectively sufficiently serious such that they posed a substantial risk of serious harm; and (2) prison officials had a "sufficiently culpable state of mind," specifically one of "deliberate indifference" to the incarcerated person's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). In their brief, Appellees do not make any arguments about the subjective prong, and have thus conceded it for purposes of the appeal. As to the objective prong, Appellees make numerous mistakes that doom their analysis.

As most relevantly here, Appellees go particularly astray by refusing to analyze the conditions in their totality. Conditions-of-confinement claims are fact specific and analyzed under the totality of the circumstances. *See Wilson v. Seiter*, 501 U.S. 294, 304-05 (1991); *Bellamy v. Bradley*, 729 F.2d 416, 420-21 (6th Cir. 1984) ("The 'totality of conditions', 'cumulative effect', or 'complex enforcement' analysis is employed where there is a lawsuit challenging the conditions of confinement."). Despite this clear precedent Appellees separately analyze the feces as another layer or an "additional concern" alongside the

16

conditions of confinement claim, instead of one of the many facts in the totality of the circumstances. This approach does not align with the precedent set by this Court, which requires looking together at the feces caked on the floors and walls of the cell; the dirt; the time he spent in the cell; the temperature; the lack of clothing, bedding, cleaning supplies, hygiene products, and shower access; and the guards' disregard for these conditions.

Instead, Appellees use non-precedential and unpersuasive cases to try to dismiss individual facts present here, without acknowledging that the totality of the circumstances here differ far exceed cases presenting only one or two similar facts. Many of the cases Appellees cite are distinguishable from the present case because the length of time was shorter; there was no direct exposure to feces; or, the plaintiff affirmatively refused a shower and shave despite officers repeatedly offering. *See Brown v. Mahlman,* No. 1:22-CV-00239, 2022 WL 17817615, at \*3 (S.D. Ohio Dec. 19, 2022) (noting occasional leaky pipe or overflowing toilet where plaintiff did not allege deliberate indifference or harm sufficient for objective prong); *Watison v. Perry*, No. 23-5059, 2024 WL 3461194 (6th Cir. Feb. 15, 2024) (noting failure on objective component because defendants offered plaintiff shower and shave and he declined, and because he did not sufficiently plead temperature claim); *Moore v. Goulet.* No. 1:22-CV-279, 2023 WL 6050393 at \*4 (W.D. Mich. Aug. 21, 2023), *report and recommendation adopted*, No. 1:22-CV-279,

17

2023 WL 6037609 (W.D. Mich. Sep. 15, 2023) (noting sewage in cell was gone within a few hours); *Taylor v. Wright*, No. 20-13041, 2023 WL 5822761 (E.D. Mich. Apr. 19, 2023), *report and recommendation adopted*, No. 20-13041, 2023 WL 4906586 (E.D. Mich. Aug. 1, 2023) (rejecting non-specific allegation of "filth" as insufficient to illustrate conditions, and observing ongoing shower access).

Appellees also cite cases easily distinguished because plaintiffs in them did not allege physical harm. *E.g. Keel v. Davidson Cnty. Sheriff's Off.*, No. CIV. 3:13-1145, 2015 WL 799724, at *2 (M.D. Tenn. Feb. 25, 2015) ("During his discovery deposition, Plaintiff Keel testified that he was claiming no physical injury resulting from this sewage leak."); *Brown*, 2022 WL 17817615, at *3 (noting no alleged harms from leaky pipe and occasional overflowing toilet). Here, of course, Julick alleged both physical and psychological harm. The physical harms include those that come with exposure to and contact with feces, denial of sanitation and hygiene, and denial of warmth. *See* Opening Brief at 32-33. The psychological harms include anxiety, depression, and the suicidal ideation prompted by the initial conditions. *Id.* at 34-35; Amend. Compl., RE22, PageID # 143.

In perhaps the most egregious instance of refusing to undertake the totality analysis, Appellees use *Taylor v. Riojas*, 592 U.S. 7 (2020), to analyze only the feces in Julick's cell. But *Taylor*, the one binding case Appellees rely on, provides them no help and only underscores why this

18

Court should reverse. *Taylor* itself uses a totality of the circumstances analysis, and provides no basis to disaggregate the feces from other conditions in the cell. And there, even with no prior on-point authority, the Supreme Court determined that the conditions of confinement were so egregious that any reasonable officer would recognize they offended the Constitution. *Taylor*, 592 U.S. at 9. Here, this Court need not reach for obviousness doctrine because *Taylor* is binding precedent that clearly established the law that bears directly on the conditions that Julick suffered—and even if it had not, the Supreme Court has signaled how egregious it finds analogous conditions.

Incidentally, even under Appellees' preferred method of disaggregation, their seven-day shower denial would itself violate the constitution on a standalone basis. This Court has outlined clear guidelines on the minimal civilized measure of life's necessities regarding sanitation and hygiene. *E.g. Walker v. Mintzes*, 771 F.2d 920, 928-29 (6th Cir. 1985); *Rivers v. Pitcher*, 68 F.3d 475 (6th Cir. 1995) (unpublished). Yet, continuing to misapply precedent, Appellees argue that the seven-day constitutional minimum this Court established for showering applies only to long-term policies. Resp. Br. at 22. This is not the case. The "constitutional minimum" language comes from this Court, not Appellant. *Walker*, 771 F.2d at 928-29; *Rivers*, 68 F.3d at 475 ("Prisoners in segregation are entitled to a constitutional minimum of one shower per week."). While denials for fewer than seven days might present a more

19

complicated question, Appellees making Julick go ten days without a shower or access to other hygiene products falls squarely within this Court's precedents which clearly established that seven days or more is a constitutional violation. *See Walker*, 771 F.2d at 928; *Richmond v. Settles*, 450 F. App'x 448, 455 (6th Cir. 2011).

### 2. Appellees cannot rely on purported exigent circumstances to excuse the conditions in which they held Julick.

Appellees' argument that exigent circumstances justified their decision to hold Julick in such deplorable conditions fails for several reasons. For one thing, Appellees' argument that confining Julick under these conditions was necessary because he was allegedly part of a riot that resulted in an officer's injury amounts to a quintessential fact dispute that precludes summary judgment, *see* Section I, *supra*. But for another, even taking that stated basis at face value, his placement in the particular cell in the restricted housing unit was not connected to the riot at all. For either reason, as in *Taylor v. Riojas*, a reasonable jury could conclude that Julick's confinement was not supported by necessity or exigency. 592 U.S. at 9.

First, Appellant would point out that Appellees' narrative does not make sense as a matter of fact. The cell as to which his conditions-of-confinement claim arises is not the one in which they initially placed him following the riot. Initially, on December 25, 2022, officers stripped

20

Julick, gave him paper boxers, and placed him in cell 4-14 left in the restricted housing unit. Amend. Compl., RE22, PageID # 141. That cell was cold, wet, had no heat, and Julick was required to stay there with no clothing or blankets, *id.*, and was surely unpleasant. But notably, despite these other deleterious conditions, cell 4-14 left was not caked in feces, and Julick had a mattress. *Id.* The next morning, after Julick expressed suicidal ideation, that Appellees moved Julick into a strip cage for monitoring. *Id.* at 142. During this monitoring, Appellees used the chemical spray on Julick that forms the basis of his excessive force claim. *Id.* It was only after *that* incident that Appellees placed Julick in cell 18-13 left, which imposed on him the feces caked walls, feces caked floors, feces packed toilets, no shower access, no cleaning supplies, no heat, no clothing, no shoes, no mattress, no bedding, and freezing conditions—for eight days. *Id.* at 143.[2]

With that context, even considering Appellees' exigency arguments on their own terms illustrates why this Court should reverse. Appellees pointing to Julick's alleged involvement in a riot, Resp. Br. at 26, fails to acknowledge that the conditions Julick experienced for eight days arose only after a second move for an unrelated reason, breaking any causative chain. Even if the riot could have provided for exigency, a reasonable jury could conclude it applied only to the first relocation; that same jury could

---

[2] Julick had no shower access for ten days.

conclude that officers switched the cell in which they held Julick to one with even worse conditions out of a motive to retaliate and punish.

On this point, Appellees also cite a handful of unpersuasive district court cases that ultimately provide them with no support. As explained, this analysis requires looking to the totality of the circumstances. The cases Appellees cite have starkly different facts, i.e., actual exigency or legitimate institutional interests, such as preventing drugs from entering the facility. *Johnson v. Cool*, No. 1:22-CV-00031, 2024 WL 3992412 (S.D. Ohio Aug. 29, 2024), *report and recommendation adopted*, No. 1:22-CV-31, 2025 WL 360607 (S.D. Ohio Jan. 31, 2025) (dry cell case); *Chilton v. Walters*, No. 3:21 CV 1312, 2022 WL 541193 (N.D. Ohio Feb. 23, 2022) (dry cell case). Appellees' use of the dry cell cases where officials had individualized suspicion that people were attempting to smuggle contraband into the facility only highlights the lack of legitimate institutional interest in the punishment Appellees imposed on Julick here.

Julick did express suicidal ideation prior to the second move—which can sometimes justify certain kinds of prison interventions that restrict liberties. But Appellees notably did not make any argument justifying holding Julick in the feces-caked based on an institutional interest of preventing potential self-harm. Nor could they. When Julick expressed suicidal ideation, he informed Appellees these thoughts were due to the conditions of cell 4-14 left—wearing only paper boxers, with no clothing,

bedding, or heat—that he experienced overnight. Amend. Compl., RE22, PageID # 141. If the prison had an interest in mitigating self-harm, moving someone experiencing thoughts of suicide because of the conditions of his cell into objectively worse conditions of confinement would only exacerbate the risk, not mitigate it.

## CONCLUSION

For the foregoing reasons, this Court should reverse the district court's grant of summary judgment on both Julick's excessive force claim against Bond and his conditions of confinement claim against Denny, Primozich Villasenor, and Jordan, and remand for further proceedings, including with instructions that Appellees produce the withheld video.

Respectfully submitted,

/s/ Jim Davy

Jim Davy
BOSTON UNIVERSITY                ALL RISE TRIAL & APPELLATE
  APPELLATE CLINIC          P.O. Box 15216
765 Commonwealth Ave.            Philadelphia, PA 19125
  Suite 1304                (215) 792-3579
Boston, MA 02215                 jimdavy@allriselaw.org
(617) 835-0884

Aryssa Harris
Cameron Tong
  Student Counsel

Counsel for Appellant

May 11, 2026

23

## CERTIFICATE OF COMPLIANCE

In accordance with Federal Rule of Appellate Procedure 32(a)(7)(C), I certify that this brief:

(i) complies with the type-volume limitation of Rule 32(a)(7)(B) because it contains 5,292 words, including footnotes and excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii); and

(ii) complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared using Microsoft Office Word, set in Century Schoolbook font in 14-point type.

/s/ Jim Davy

Jim Davy

1

## CERTIFICATE OF SERVICE

I certify that on May 11, 1106 this brief was filed using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system.

<u>/s/ Jim Davy</u>

Jim Davy

2