**No. 25-5667**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

Jacob Julick,

*Plaintiff–Appellant*,

v.

Scott Jordan, et al.,

*Defendants–Appellees*.

Appeal from the United States District Court
for the Western District of Kentucky
Case No. 5:23-CV-51
The Honorable Joseph H. McKinley, Jr.

# APPELLANT'S REPLY TO APPELLEES' RESPONSE TO SHOW CAUSE ORDER


Jim Davy
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125

Ellen Noble
RODERICK & SOLANGE
MCCARTHUR JUSTICE CENTER
501 H St. NE, Suite 275
Washington, DC 20002

Madeline Meth
BOSTON UNIVERSITY APPELLATE
CLINIC
765 Commonwealth Ave.
Suite 1304
Boston, MA 02215
(617) 835-0884

*Counsel for Plaintiff–Appellant*


September 11, 2026

On August 7, 2026, this Court directed Defendants-Appellees to show cause why the video of Defendant Officer Dylan Bond pepper spraying Plaintiff-Appellant Jacob Julick while Julick was shackled, handcuffed, on his knees, and in a locked strip cage should remain under seal. Defendants responded to that order on August 28, 2026, and Julick replies to that response here.

"The federal courts do their business in public—which means the public is presumptively entitled to review every" item "that a party files with the court for purposes of influencing a judicial decision." *Grae v. Corr. Corp. of Am.*, 134 F.4th 927, 930 (6th Cir. 2025); *see also Shane Group, Inc. v. Blue Cross Blue Shield of Mich.*, 825 F.3d 299, 305 (6th Cir. 2016); *In re Knoxville News Sentinel Co., Inc.*, 723 F.2d 470, 476 (6th Cir. 1983). "Only the most compelling reasons" may overcome the presumption that judicial records be publicly available. *Knoxville News-Sentinel*, 723 F.2d at 476.

"[W]hen a court does seal off judicial records from public view, it must explain 'why the interests in support of nondisclosure are compelling, why the interests supporting access are less so, and why the seal itself is no broader than necessary[.]'" *Grae*, 134 F.4th at 930 (quoting *Shane Group, Inc.*, 825 F.3d at 306). The "heavy" burden of meeting this standard is "borne by the party that seeks to seal" records. *Shane Group, Inc.*, 825 F.3d at 305. For the reasons explained below, Defendants have not met their burden to show why the pepper-spray-incident video (or any

part of the video) meets this Court's "demanding requirements for a seal." *Id.* at 308.

## I. Defendants fail to demonstrate a clearly defined and serious injury that would result from making this specific footage public.

To demonstrate that "the interests favoring non-disclosure" are "compelling," the party seeking sealing must show on a "line-by-line basis"—or in this case, a frame-by-frame basis—that the "specific information in the court record" would create a "clearly defined and serious injury" if disclosed. *Grae*, 134 F.4th at 932 (citing *Shane Group, Inc.*, 825 F.3d at 307).

The proponent for non-disclosure may not rely on mere assertions of a general interest in confidentiality. *Id.*; *In re Cendant Corp.*, 260 F.3d 183, 194 (3d Cir. 2001). Likewise, "[s]imply mentioning a general category of privilege, without any further elaboration or any specific linkage with the documents, does not satisfy the burden." *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1184 (9th Cir. 2006); *see Piggie v. Cotton*, 344 F.3d 674, 679 (7th Cir. 2003) ("We have never approved of a blanket policy of keeping confidential security camera videotapes for safety reasons … .").[1]

---

[1] *See also Taylor v. Keener,* No. 2:22-CV-092-DCLC-CRW, 2024 WL 931090, at *2 (E.D. Tenn. Mar. 4, 2024) (rejecting "general statements" as failing to meet the standard for non-disclosure of particular video footage from inside a prison.); *Hermiz v. Budzynowski*, No. 16-11214,

Instead, proponents for non-disclosure must identify a clearly defined and serious injury, *Shane Group, Inc.*, 825 F.3d at 307, and "articulate the factual basis" for sealing "without relying on hypothesis or conjecture," so that the Court in its ruling can do the same. *Kamakana*, 447 F.3d at 1179 (internal citations omitted); *see Binh Hoa Le v. Exeter Fin. Corp.*, 990 F.3d 410, 417-19 (5th Cir. 2021) (explaining why courts are required to provide specific compelling reasons for sealing documents on a line-by-line basis).

All Defendants offer here, however, are hypothetical concerns about "prison safety and security," which are not grounded in specific frames of the footage or another factual basis. Defs.' Resp. 2. They assert that the video would show "the methods of surveillance, camera angles, camera blind spots, and would show the layout … ." *Id.* at 2. But Defendants have offered no information to suggest that this video reveals anything unavailable to someone physically present in the prison facility.

Litigants have a diminished interest in secrecy where information is "already public." *In re Search Warrant*, No. M-3-94-80, 1996 WL 1609166,

---

2017 WL 1245079, at *3 (E.D. Mich. Apr. 5, 2017) (explaining that "vaguely phrased fears of 'compromising police operations' are inadequate to justify sealing"); *Lambert v. City of Saginaw,* No. 21-12929, 2023 WL 3309828, at *2 (E.D. Mich. May 8, 2023) (citing *Hermiz*, 2017 WL 1245079, at *3) ("Defendants' perfunctory assertions that disclosure of the 2017 Policy would result in dangers to officers are insufficient to carry Defendants' burden of establishing a compelling reason for nondisclosure under *Shane* … .").

at *3 (S.D. Ohio Aug. 20, 1996). Here, the public already has access to videos of areas within KSP, including the segregation unit. *See e.g.*, S01E06 Lockup Kentucky State Prison KSP, at 07:40 (YouTube, Sep. 27, 2019), https://www.youtube.com/watch?v=g1S7dDhlORQ. Where "all sensitive information" in the video has "already been previously disclosed, then public release of" it "would have no impact on institutional security, and thus, the interest of institutional security would not warrant sealing." *Bornstein v. Cnty. of Monmouth*, No. CIV. 11-5336, 2014 WL 6386804, at *3 (D.N.J. Nov. 14, 2014). Further, because inmates already see and know KSP's camera locations and angles, they can share this information with the public. *See Evans v. Fed. Bureau of Prisons*, 951 F.3d 578, 588 (D.C. Cir. 2020) (finding no justification for withholding prison footage in response to public records request because prison did not establish that disclosing footage "would in fact provide any new information not already available through observation by prisoners physically present in the ... room" who could presumably see the camera).

Defendants' assertion that publicly available footage could be "slowed down, replayed, and studied" and therefore could lead to a security concern is "conjecture." *Kamakana*, 447 F.3d at 1179. Indeed, Defendants have not established that the camera angle reveals any blind spot. *See Evans*, 951 F.3d at 588 (finding no justification for withholding surveillance footage where prison's affidavit "[did] not address the field of view … so as to reveal potential blind spots"). And even if it did, KSP

could immediately remedy any blind spots. *See* 28 C.F.R. § 115.13(a)(5) (assessing video monitoring needs includes considering "blind-spots").

Defendants also say that the video here should be sealed because it shows "how and when" the area "of the prison"—that is, the restricted housing unit—"is used." Defs.' Resp. 2. But again, prisoners are taken in and out of this area, and they already know how and when it is used. Nor do defendants explain why concealing that information is critical to maintaining security. *Supra* 4-5. And the fact that this area of the prison is used when there are heightened tensions, causing officials to exercise the most coercive authority, only intensifies the public's interest in access and the need for public accountability. *See Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572 (1980). After all, "[p]eople in an open society do not demand infallibility from their institutions, but it is difficult for them to accept what they are prohibited from observing." *Id.* As one court has put it, "[c]ertainly every detail of prison life need not be on display for public consumption," "[b]ut when there is a claim that prisoner abuse has occurred, there can be little justification for concealing key evidence that exposes the wrongdoer or vindicates the accused personnel." *Evans v. Mallory,* No. 08-12725, 2009 WL 2900718, at *4 (E.D. Mich. Sept. 2, 2009). That includes when the conduct occurs in a part of the prison where people are segregated from the general population.

## II. Public access to the prison surveillance-footage is essential to holding prison officials and courts accountable.

Defendants understate the public's compelling interests in accessing the video footage at issue here. Access to the pepper-spray-incident video serves the compelling interest of allowing the public to understand the force relied upon at KSP and assess whether that force is reasonable. When video footage depicts potential government misconduct, the public interest in accountability and transparency outweighs generalized, speculative safety concerns. *Richmond Newspapers, Inc.*, 448 U.S. at 572. Sealing the footage removes the most probative evidence of how force was employed from public view, effectively insulating correctional officers from public scrutiny.

"[P]ublic access" also "provides an element of accountability" for the courts. *Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1178 (6th Cir. 1983). "One of the ways [courts] minimize judicial error and misconduct is through public scrutiny and discussion." *Id.* "Sometimes, the public's interest is focused primarily upon the litigation's result—whether a right does or does not exist, or a statute is or is not constitutional." *Shane Grp., Inc.*, 825 F.3d at 305. In other cases, like this one, however, "the public's interest is focused not only on the result, but also on the conduct giving rise to the case." *See id.* In cases like this one, "the public is entitled to assess for itself the merits of judicial decisions." *Id.* Here, "[t]he public has an interest in

ascertaining what evidence" this Court "relied upon" in reaching its merits decision. *Id.*

Access to the footage here enables the public to effectively understand and follow the underlying litigation as well as engage with contested questions about the appropriate limits of force within prisons outside of the court system. This Court concluded that the use of pepper spray depicted in the footage did not constitute excessive force. *See Julick v. Jordan*, No. 25-5667, 2026 WL 2455146, at *4 (6th Cir. Aug. 21, 2026). To assess that decision and determine whether legislative, political action, or other advocacy is necessary in response, the public needs to be able to view the relevant pepper-spray incident for itself.

Defendants argue that the district court's description of the pepper-spray-incident video is sufficient for the public to follow these proceedings. Defs.' Resp. 6. That assertion is wrong. Video evidence has a uniquely powerful ability to inform public understanding of the incident. *C.f. McNair v. Pratt*, No. 24-1362, 2025 WL 2529819, at *3 (6th Cir. Sep. 3, 2025) (noting that video evidence showing "disputed events is highly useful, and can singlehandedly decide" a motion for summary judgment). Indeed, that is likely why Defendants relied on video footage to support their summary-judgment motion rather than relying on testimony alone. A written description of the pepper spray incident, however detailed, cannot convey the same information as the footage itself. The public's ability to observe the incident firsthand, assessing the

prison officials' and the inmate's response in real time, cannot be replaced by reading a secondhand account. *C.f. Feagin v. Mansfield Police Dep't*, 155 F.4th 595, 600 (6th Cir. 2025) (noting that "video evidence makes us far better equipped to evaluate claims tied to an officer's conduct"); *Perez v. City of Fresno*, 482 F. Supp. 3d 1037, 1044, 1048 (E.D. Cal. 2020) ("[R]ecent public discussion … has shown that video footage facilitates public discourse in a way that print descriptions do not."). Keeping the video footage sealed substantially diminishes the public's ability to fully follow along with and evaluate these proceedings.

### III. The seal is not narrowly tailored to serve any marginal interest in security.

The footage at issue does not present a definite and real risk to Defendants' or anyone else's safety and security, and the seal should be vacated on that basis alone. However, even if Defendants had established a legitimate security concern in disclosing frames of this specific footage, the existing seal here would be overly broad. *Shane Group, Inc.*, 825 F.3d at 305. The nondisclosure of court records must be narrowly tailored to serve any compelling confidentiality interest. *Id.*

Rather than sealing the footage in its entirety, there are several less restrictive alternatives that would adequately address any negligible security threat. A redaction of sensitive details or disclosure of only part of the footage each represent straightforward and inexpensive measures that would protect any legitimate confidentiality interest while

preserving the public's right of access. *See Evans*, 951 F.3d at 587. In contrast, a complete seal of the video is the most extreme option—and wholly disproportionate to any marginal security concern. A complete seal deprives the public of its ability to fully evaluate the pepper-spray incident, allowing prison officials to evade any meaningful scrutiny or vindication and making it difficult for the public to evaluate this Court's reasoning.

## Conclusion

For the foregoing reasons, this Court should unseal the video of Officer Bond pepper spraying Julick on its docket.

Respectfully submitted,

/s/ Madeline Meth

Madeline Meth
BOSTON UNIVERSITY APPELLATE CLINIC
765 Commonwealth Ave.
Suite 1304
Boston, MA 02215
(617) 835-0884

Jim Davy
ALL RISE TRIAL & APPELLATE
P.O. Box 15216
Philadelphia, PA 19125

Ellen Noble
RODERICK & SOLANGE MCCARTHUR JUSTICE CENTER
501 H St. NE, Suite 275
Washington, DC 20002

*Counsel for Plaintiff–Appellant*

September 11, 2026

## CERTIFICATE OF COMPLIANCE

I certify that this Response complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 2,052 words, excluding the parts of the motion exempted by Fed. R. App. P. 27(a)(2)(B). The Response complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word for Office 365 and Century Schoolbook 14-point font.

/s/Madeline Meth

## CERTIFICATE OF SERVICE

I certify that on September 11, 2026 this brief was filed using the Court's CM/ECF system. All participants in the case are registered CM/ECF users and will be served electronically via that system.

/s/ Madeline Meth